Case No. 22-5346

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

TERRY CASH-DARLING, as Personal Representative
of the Estate of Paul Cash, Decedent,

Plaintiff-Appellant,

v.

RECYCLING EQUIPMENT, INC.,

Defendant-Appellee.

On Appeal from the United States District Court
for the Eastern District of Tennessee
Case No. 2:19-cv-00034

_____

APPELLANT'S BRIEF

_____

Michael J. Wall
Janna Maples
BRANSTETTER, STRANCH &
   JENNINGS, PLLC
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Telephone: (615) 254-8801
Facsimile: (615) 255-5419
michaelw@bsjfirm.com
jannam@bsjfirm.com

John C. Duff
Marion M. Reilly
HILLIARD MARTINEZ
   GONZALES LLP
719 South Shoreline Boulevard
Corpus Christi, Texas 78401
Telephone: (361) 882-1612
Facsimile: (361) 882-3015
jduff@hmglawfirm.com
marion@hmglawfirm.com

*Attorneys for Appellant*

## CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1 and Sixth Circuit Rule

26.1, Appellant hereby makes the following disclosures:

(1)  Is said party a subsidiary or affiliate of a publicly owned corporation?    No

(2)  Does a publicly owned corporation or its affiliate, not a party to the appeal, have a financial interest in the outcome?    No

# TABLE OF CONTENTS

CORPORATE DISCLOSURE STATEMENT ...........................................i

TABLE OF CONTENTS ........................................... ii

TABLE OF AUTHORITIES ....................................................iv

STATEMENT IN SUPPORT OF ORAL ARGUMENT .........................................1

STATEMENT OF JURISDICTION.........................................1

STATEMENT OF THE ISSUES.........................................3

STATEMENT OF THE CASE.........................................4

    I.    A DEFECTIVE MACHINE SOLD BY REI KILLED MR. CASH..........4

    II.    THE DISTRICT COURT GRANTED SUMMARY JUDGMENT BECAUSE REI SUPPOSEDLY RELIED ON SPECIFICATIONS FROM ITS CUSTOMER .........................................12

SUMMARY OF THE ARGUMENT ....................................15

ARGUMENT .........................................17

    I.    THIS APPEAL CALLS FOR DE NOVO REVIEW ............................. 17

    II.    THE DISTRICT COURT MADE A LEGAL ERROR BY APPLYING THE CONTRACT SPECIFICATION DEFENSE TO CLAIMS THAT SOUND IN STRICT LIABILITY...............................18

        A.    A Prima Facie Strict Liability Claim Has Nothing to Do with Plans and Specifications .......................................18

        B.    No Authority from Tennessee Authorizes the Defense in a Strict Liability Case.........................................19

        C.    Other Jurisdictions Have Split Almost Evenly on This Issue........23

D.  Tennessee Has True Strict Liability with No Room for the Defense .................................................................27

E.  The Defense is Incompatible with the Policies in Tennessee Law .......................................................................29

F.  For the Same Reasons as the Strict Liability Claim, the Failure to Warn and Breach of Warranty Claims Are Not Subject to the Defense ....................................................31

G.  This Appeal Does Not Involve the Component Parts Doctrine .........................................................................32

III.  THE DISTRICT COURT FAILED TO VIEW THE RECORD IN A LIGHT FAVORABLE TO MS. CASH-DARLING AND MISAPPLIED THE DEFENSE TO THE FACTS ..................................35

A.  A Genuine Issue of Material Fact Exists on Whether REI Just Followed Specifications or Contributed to the Defective Design ...........................................................................35

B.  A Genuine Issue of Material Fact Exists on Whether the Defect Was Objectively Obvious ..................................43

CONCLUSION ...........................................................................47

CERTIFICATE OF COMPLIANCE ..........................................49

CERTIFICATE OF SERVICE ....................................................49

DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS ..............50

# TABLE OF AUTHORITIES

**Federal Cases**

*Abdul-Warith v. Arthur G. McKee & Co.*,
    488 F. Supp. 306 (E.D. Pa. 1980) ........................................................................23

*ACLU of Ohio Found., Inc. v. DeWeese*,
    633 F.3d 424 (6th Cir. 2011) ...............................................................................43

*Am. Ref-Fuel Co. of Niagara, LP v. Gensimore Trucking, Inc.*,
    No. 02-CV-814C, 2007 WL 2743449 (W.D.N.Y. Sept. 18, 2007) ...................35

*Anderson v. Liberty Lobby, Inc.*,
    477 U.S. 242 (1986) ...........................................................................................18

*Austin v. Clark Equip. Co.*,
    48 F.3d 833 (4th Cir. 1995) .................................................................14, 20, 37

*Boyle v. United Techs. Corp.*,
    487 U.S. 500 (1988) ...........................................................................................24

*Butler v. Navistar Int'l Transp. Corp.*,
    809 F. Supp. 1202 (W.D. Va. 1991) ...................................................................37

*Challoner v. Day & Zimmermann, Inc.*,
    512 F.2d 77 (5th Cir. 1975) .................................................................................23

*Hatch v. Trail King Indus., Inc.*,
    656 F.3d 59 (1st Cir. 2011) .................................................................................25

*Herrod v. Metal Powder Prods.*,
    886 F. Supp. 2d 1271 (D. Utah 2012) .......................................................24, 26, 37

*Housand v. Bra-Con Indus., Inc.*,
    751 F. Supp. 541 (D. Md. 1990) .........................................................................24

*Hoverman v. Harnischfeger Corp.*,
    No. 90-1682, 1991 WL 158768 (6th Cir. Aug. 14, 1991) ...........................14, 19

*In re Refrigerant Compressors Antitrust Litig.*,
    731 F.3d 586 (6th Cir. 2013) ................................................................................1

*Janusz v. Symmetry Med. Inc.*,
    256 F. Supp. 3d 995 (E.D. Wis. 2017) ....................................................23, 24, 28

*Johnston v. United States*,
    568 F. Supp. 351 (D. Kan. 1983).............................................................23, 24, 47

*Kern v. Roemer Mach. & Welding Co.*,
    820 F. Supp. 719 (S.D.N.Y. 1992) .....................................................................26

*Mesman v. Crane Pro Services*,
    512 F.3d 352 (7th Cir. 2008) ..............................................................................25

*Nygaard v. United Parcel Serv. Gen. Servs. Co.*,
    1 F. Supp. 2d 1173 (D. Or. 1998) .......................................................................36

*Rardon v. Holland, LP*,
    279 F. Supp. 3d 93 (D.D.C. 2017) ........................................................24, 25, 37

*Rockwell Int'l Corp. v. United States*,
    549 U.S. 457 (2007).............................................................................................1

*Roy v. Star Chopper Co.*,
    442 F. Supp. 1010 (D.R.I. 1977) ........................................................................23

*Saginaw Chippewa Indian Tribe of Mich. v. Blue Cross Blue Shield of*
    *Mich.*,
    32 F.4th 548 (6th Cir. 2022) ................................................................17, 18, 43

*Shaw v. Grumman Aerospace Corp.*,
    778 F.2d 736 (11th Cir. 1985) ............................................................................24

*Sigler v. Am. Honda Motor Co.*,
    532 F.3d 469 (6th Cir. 2008) ..............................................................................19

*Spangler v. Kranco, Inc.*,
    481 F.2d 373 (4th Cir. 1973) ..................................................................14, 20, 37

*Thompson v. Hirano Tecseed Co.*,
    456 F.3d 805 (8th Cir. 2006) ..............................................................24, 26, 36

*Tooling, Mfg. & Techs. Ass'n v. Hartford Fire Ins. Co.*,
    693 F.3d 665 (6th Cir. 2012) ..............................................................................18

*Water Pollution Control Auth. of City of Norwalk v. Flowserve US Inc.*,
No. 3:14-CV-00549 (VLB), 2018 WL 1525709 (D. Conn. Mar. 28, 2018) ...................................................................................................24

*Webb v. Ethicon, Inc.*,
No. 3:19-CV-461-TAV-DCP, 2020 WL 5503646 (E.D. Tenn. Sept. 11, 2020) .................................................................................19

*Wirth v. Clark Equip. Co.*,
457 F.2d 1262 (9th Cir. 1972) .......................................................................23

*Ziegler v. IBP Hog Market, Inc.*,
249 F.3d 509 (6th Cir. 2001) .........................................................................18

**State Cases**

*Bloemer v. Art Welding Co.*,
884 S.W.2d 55 (Mo. Ct. App. 1994) .............................................................25

*Brawner v. Blue Chip Enters. Maint., Inc.*,
1990 WL 138996 (Tenn. Ct. App. Sept. 26, 1990) ................................passim

*Browder v. Pettigrew*,
541 S.W.2d 402 (Tenn. 1976) .......................................................................31

*Burks v. Belz-Wilson Properties*,
No. 02A01-9411-CV-00254, 1996 WL 84859 (Tenn. Ct. App. Feb. 26, 1996) ...................................................................................................20

*Campbell v. ITE Imperial Corp.*,
733 P.2d 969 (Wash. 1987) ...........................................................................32

*Davis v. Komatsu Am. Indus. Corp.*,
42 S.W.3d 34 (Tenn. 2001)....................................................................14, 32

*Dorse v. Armstrong World Indus., Inc.*,
513 So. 2d 1265 (Fla. 1987) ....................................................................23, 24

*Ford Motor Co. v. Eads*,
457 S.W.2d 28 (Tenn. 1970) .........................................................................29

*Hannah v. Gregg, Bland & Berry, Inc.*,
  840 So. 2d 839 (Ala. 2002) ................................................................. 43

*Hopfer v. Neenah Foundry Co.*,
  477 S.W.3d 116 (Mo. Ct. App. 2015) ................................................ 35

*Houlihan v. Morrison Knudsen Corp.*,
  768 N.Y.S.2d 495 (N.Y. App. Div. 2003) .......................................... 25

*Johnson v. Oman Const. Co.*,
  519 S.W.2d 782 (Tenn. 1975) ............................................................ 20

*Lind v. Beaman Dodge, Inc.*,
  356 S.W.3d 889 (Tenn. 2011) ............................................................ 31

*Maldonado v. Creative Woodworking Concepts, Inc.*,
  796 N.E.2d 662 (Ill. App. Ct. 2003) ............................................ 23, 32

*McCabe Powers Body Co. v. Sharp*,
  594 S.W.2d 592 (Ky. 1980) ...................................................... 25, 26, 37

*Michalko v. Cooke Color & Chem. Corp.*,
  451 A.2d 179 (N.J. 1982) ............................................................... 23, 32

*Moon v. Winger Boss Co.*,
  287 N.W.2d 430 (Neb. 1980) ............................................................. 25

*Nye v. Bayer Cropscience, Inc.*,
  347 S.W.3d 686 (Tenn. 2011) ...................................................... 28, 33

*Owens v. Truckstops of Am.*,
  915 S.W.2d 420 (Tenn. 1996) ............................................................ 29

*Queen City Terminals, Inc. v. Gen. Am. Transp. Corp.*,
  653 N.E.2d 661 (Ohio 1995) ....................................................... 25, 30

*Rawlings v. D. M. Oliver, Inc.*,
  159 Cal. Rptr. 119 (Cal. Ct. App. 1979) ........................................... 23

*Snyder v. LTG Lufttechnische GmbH*,
  955 S.W.2d 252 (Tenn. 1997) ...................................................... 30, 31

*Whitehead v. Toyota Motor Corp.*,
   897 S.W.2d 684 (Tenn. 1995) ...........................................................29

**Federal Statutes**

28 U.S.C. § 1291 ....................................................................................2

28 U.S.C. § 1332 ................................................................................1, 2

**State Statutes**

Tenn. Code Ann. §§ 29-28-101 to -108 ...............................................18

Tenn. Code Ann. § 29-28-102 .......................................................19, 33

Tenn. Code Ann. § 29-28-104 ..............................................................20

Tenn. Code Ann. § 29-28-105 ..............................................................28

Tenn. Code Ann. § 29-28-106 ..............................................................20

Tenn. Code Ann. § 47-2-314 ................................................................12

Tenn. Code Ann. § 47-2-315 ................................................................12

Tenn. Code Ann. § 50-6-108 ................................................................30

**Federal Rules**

Fed. R. App. P. 4 ...................................................................................2

Fed. R. Civ. P. 56 ................................................................................17

Fed. R. Civ. P. 59 .................................................................................2

**Other Authorities**

*Black's Law Dictionary* (11th ed. 2019) ...............................................36

*Restatement (Second) of Torts* § 402A (1965) ................................27, 29

*Restatement (Second) of Torts* § 404 (1965) ...................22, 27, 28, 36, 43

*Restatement (Third) of Torts: Products Liability* § 5 (1998)...................................32

## STATEMENT IN SUPPORT OF ORAL ARGUMENT

The Court should grant oral argument because this appeal raises important issues of first impression in Tennessee law.  The district court dismissed products liability claims at summary judgment because it found that the manufacturer relied on plans and specifications from its customer.  Other jurisdictions disagree on whether this defense applies to strict liability claims.  The Court will have to predict how the Tennessee Supreme Court would rule.  From the record, the Court must determine whether a genuine issue of material fact exists as to the manufacturer's role in the product design or the obviousness of the defect.  Oral argument will help the Court assess these issues.

## STATEMENT OF JURISDICTION

The district court had subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because this action is between citizens of different states and the amount in controversy exceeds $75,000, exclusive of interest and costs.

Terry Cash-Darling sued as the personal representative of the estate of her brother, Paul Cash.  (Second Amended Complaint introduction, ¶ 1, RE 39, PageID # 834).[1]  The diversity jurisdiction statute deems the legal representative of an

---

[1] When a plaintiff has amended her complaint, courts look to the allegations of the amended pleading to determine jurisdiction. *Rockwell Int'l Corp. v. United States*, 549 U.S. 457, 473-74 (2007); *In re Refrigerant Compressors Antitrust Litig.*, 731 F.3d 586, 589 (6th Cir. 2013).

estate to be a citizen of the same state as the decedent.  28 U.S.C. § 1332(c)(2).

Mr. Cash was a citizen of Tennessee, (Second Amended Complaint ¶ 3, RE 39,

PageID # 835), which makes Ms. Cash-Darling a citizen of Tennessee for

jurisdictional purposes.

The defendant, Recycling Equipment, Inc. ("REI"), is a North Carolina

corporation.  (*Id*. ¶ 2, RE 39, PageID # 834).  The statute deems REI to be a citizen

of North Carolina, its place of incorporation.  *See* 28 U.S.C. § 1332(c)(1).

Ms. Cash-Darling prayed for damages of $5,000,000 for her brother's pain

and suffering, emotional distress, wrongful death, lost wages, and funeral

expenses.  (Second Amended Complaint ¶ 15, RE 39, PageID # 843-44).

This Court has appellate jurisdiction pursuant to 28 U.S.C. § 1291.  The

district court entered a final order and judgment disposing of all claims on

November 12, 2021.  (Memorandum Opinion and Order, RE 135, PageID # 1730-

42); (Judgment, RE 136, PageID # 1743).  On December 10, 2021, Ms. Cash-

Darling filed a timely motion to alter or amend the judgment and supporting brief

pursuant to Fed. R. Civ. P. 59(e).  (Plaintiff's Motion to Alter or Amend, RE 137,

PageID # 1744-53).  The time to appeal ran from the entry of the order disposing

of this post-judgment motion.  *See* Fed. R. App. P. 4(a)(4)(A)(iv).  The district

court denied the motion on March 22, 2022.  (Memorandum Opinion and Order at

5, RE 143, PageID # 1776).  Plaintiff timely appealed from the final order and

judgment on April 20, 2022.  (Plaintiff's Notice of Appeal, RE 144, PageID # 1777-78).

## STATEMENT OF THE ISSUES

REI assembled a shredding machine for Lighting Resources, LLC that exploded shortly after installation, killing Mr. Cash.  The machine did not have a proper dust collection system.  A government investigation concluded that aluminum dust caused the explosion.  At summary judgment, the district court dismissed products liability claims against REI on the basis that it manufactured the machine according to plans and specifications from Lighting Resources, LLC.  This appeal presents the following issues:

(1)   Would the Tennessee Supreme Court join other courts in holding that the contract specification defense does not apply to strict liability, failure to warn, or breach of warranty claims, since these claims do not require a showing of negligence?

(2)   Does a genuine issue of material fact exist as to whether REI followed its customer's specifications when the customer did not specify anything about dust collection?

(3)   Does a genuine issue of material fact exist as to whether the defect would be obvious to a competent contractor, negating the contract specification defense?

## STATEMENT OF THE CASE

## I.     A DEFECTIVE MACHINE SOLD BY REI KILLED MR. CASH

Lighting Resources, LLC recycles lightbulbs and other lighting components. (Declaration of Steve Barnett ¶ 3, RE 95-1, PageID # 1051).  In 2015, it opened a facility in Johnson City, Tennessee.  (*Id*. ¶ 2, RE 95-1, PageID # 1051).  Steve Barnett supervised that facility, and Mr. Cash worked there.  (*Id*.).

The Johnson City facility started to recycle air bag modules and seatbelt pretensioners in late 2016.  (*Id*. ¶ 3, RE 95-1, PageID # 1051).  To do this, Mr. Barnett purchased a used shredder and assembled it with an input conveyor, a discharge conveyor, and a discharge bin.  (*Id*. ¶ 4, RE 95-1, PageID # 1052). Lighting Resources, LLC used an exhaust fan to pull smoke from the air bags' explosive charges out of the building.  (*Id*.).

Lighting Resources, LLC used this equipment for more than a year.  (*Id*. ¶ 5, RE 95-1, PageID # 1052).  However, the shredder was not durable enough, and Mr. Barnett wanted to process more material.  (*Id*.).

Mr. Barnett contacted REI in 2017 about purchasing different equipment. (*Id*.).  He told REI what he wanted, as follows:

> I described LR's existing system to REI and explained what I was doing with it, and asked them if they could get me some equipment that was similar to what we had, but with a more durable, more heavy duty shredder, and one that was capable of processing a greater amount of material.

(*Id*. ¶ 6, RE 95-1, PageID # 1052).

Joey Walls was a managing principal of REI, (Deposition of Joey Walls 8:25-9:5, RE 101-10, PageID # 1397), and Mr. Barnett's initial point of contact at REI, (*id*. 13:14-25, RE 101-10, PageID # 1398). Mr. Walls recalled their communications similarly. Mr. Barnett said he was already processing airbags and "just needed something that could do it faster, more volume." (*Id*. 13:14-14:8, RE 101-10, PageID # 1398-99); *see also* (*id*. 15:21-16:3, RE 101-10, PageID # 1399) (Mr. Barnett said, "[I] want a bigger one that's faster, my process is working, I just need to go faster.").

This was the first job REI had done for Lighting Resources, LLC. (*Id*. 11:20-24, RE 101-10, PageID # 1398). It was also the first and only time REI sold a machine for shredding metal. (*Id*. 55:5-21, RE 101-10, PageID # 1409). Scott Sharp was the President of REI. (Deposition of Scott Sharp 7:2-4, RE 101-2, PageID # 1310). He testified, "I knew nothing about metals, shredding metals or what is inside of an air bag." (*Id*. 13:15-17, RE 101-2, PageID # 1311). REI did not have any personnel who dealt with occupational health and safety regulations. (Deposition of Joey Walls 85:3-24, RE 101-10, PageID # 1416).

REI located a used hammermill shredder that it could purchase and resell to Lighting Resources, LLC. (Declaration of Steve Barnett ¶ 6, RE 95-1, PageID # 1052). "After further discussions about the additional components necessary to

complete the system," Lighting Resources, LLC agreed to purchase a hammermill system from REI. (*Id*.). Mr. Barnett expected the system to include the used hammermill, a used input conveyor, a new discharge conveyor built by REI, and an exhaust fan to pull smoke out of the building. (*Id*.).

Hammermills have a shredding action that creates dust. (Deposition of Chris Cloney 55:9-13, RE 101-11, PageID # 1448). The material going through a hammermill normally gets hot. (*Id*. 86:19-22, RE 101-11, PageID # 1456). Hammermills are "well known" to have fires, (*id*. 74:6-9, RE 101-11, PageID # 1453), and dust explosions, (*id*. 15:13-14, RE 101-11, PageID # 1438). These events are "quite common." (*Id*. 47:20-24, RE 101-11, PageID # 1446).

Lighting Resources, LLC only cared about visible smoke from the air bag modules. (Declaration of Steve Barnett ¶ 9, RE 95-1, PageID # 1053). This was the only concern Mr. Barnett communicated to REI. (*Id*.). Mr. Barnett said he was dealing with smoke and "that [REI] needed to get the smoke evacuated out." (Deposition of Joey Walls 74:12-18, RE 101-10, PageID # 1414).

REI sold dust collectors as part of its regular business. (Deposition of Scott Sharp 11:9-12, 39:1-40:3, RE 101-2, PageID # 1311, 1318). It did not sell dust collectors for metal, specifically, (*id*. 12:14-18, RE 101-2, PageID # 1311), as most of its equipment went to the paper industry, (*id*. 58:5-6, RE 101-2, PageID # 1323). At the time of the explosion that killed Mr. Cash, dust collectors that could have

mitigated or eliminated the hazard were commercially available.  (*Id*. 63:17-22, RE 101-2, PageID # 1324).

REI's invoice for the system listed a hammermill, an infeed conveyor, a discharge shaker, a discharge conveyor, a "[d]ust collector," and controls.  (Invoice at 1, RE 101-5, PageID # 1342).  REI "agree[d] to test material in Hammer Mill to ensure it adequately meets Customer need" and then "build out [the] full system to be delivered to customer."  (*Id*.).  The purchase price was $226,000.  (*Id*. at 2, RE 101-5, PageID # 1343).

An REI employee named Ethan Eichelberger prepared drawings of the hammermill shredder assembly.  (Declaration of Steve Barnett ¶ 8, RE 95-1, PageID # 1053).  The last page gives an overhead view.  (Shredder Plan at 5, RE 101-9, PageID # 1393).  On the left-hand side, a tube runs from the exterior wall of the building to a circle labeled "NEW AIR FILTER."

The drawings have a box at the bottom labeled "SAFETY REVIEW."  It states, "As systems integrator, please advise your customer of devices that are appropriate for his/her application, based on your safety assessment. . . . Compliance with federal, state, OSHA and local laws or codes are [*sic*] the responsibility of both you, as the systems integrator/distributor, and the end user." (*Id*.).

Mr. Eichelberger's drawings were by far the most formal and detailed

description of the hammermill shredder assembly. However, witnesses from REI and Lighting Resources, LLC agreed that these were not design drawings and that they merely showed the dimensions of the system. (Declaration of Steve Barnett ¶ 8, RE 95-1, PageID # 1053); (Deposition of Ethan Eichelberger 32:21-23, RE 95-4, PageID # 1071); (Deposition of Scott Sharp 44:13-25, RE 101-2, PageID # 1319). No specifications existed for the system:

> Q.    Where are the specifications that were used in the assembly and construction of the system if these are not they?
>
> A.    There wasn't none. This was just a used system.

(*Id*. 45:4-8, RE 101-2, PageID # 1319).

Mr. Sharp testified that REI did not reach out to a company like Spencer that sells aluminum dust collectors because, with "Mr. Barnett being the specialist, it wasn't needed." (*Id*. 24:14-21, RE 101-2, PageID # 1314).

In fact, REI did reach out to Spencer and discuss dust collection internally. Mr. Eichelberger wrote to Mr. Walls, "Here is more information on the available bags for the dust separator for the Lighting Resources project. They couldn't tell me which of these filters would be the most useful with Nitrogen gas." (Ethan Eichelberger Email, RE 101-6, PageID # 1345). Mr. Eichelberger forwarded an email from Spencer discussing a "tubular bag separator" and a "baghouse." (*Id*.). The terminology in this email chain refers to a dust collection system, not an exhaust fan for smoke. *See* (Deposition of Chris Cloney 75:19-76:12, RE 101-11,

PageID # 1453).

REI did a brief test run to make sure the machine would operate. (Deposition of Joey Walls 29:12-22, RE 101-10, PageID # 1402). Shortly after that, in late 2017, REI tested the machine again with Mr. Barnett present. (*Id*. 29:25-32:5, RE 101-10, PageID # 1402-03). The second test took place outside at REI's location. (Deposition of Scott Sharp 17:5-12, RE 101-2, PageID # 1312). REI shredded 20 to 30 air bag detonators or seatbelt pretensioners. (*Id*. 18:11-19:4, RE 101-2, PageID # 1313); (Deposition of Ethan Eichelberger 30:4-10, RE 95-4, PageID # 1071). According to different witnesses, the testing lasted about 10 minutes, (Deposition of Scott Sharp 21:6-11, RE 101-2, PageID # 1313), or 20 to 30 minutes, (Deposition of Joey Walls 26:18-22, RE 101-10, PageID # 1402).

REI sold the hammermill shredder assembly as a complete unit and put it together at Lighting Resources, LLC's facility. (*Id*. 50:8-51:25, RE 101-10, PageID # 1408). REI provided the controls that made the different components work together. (Deposition of Scott Sharp 15:24-16:12, RE 101-2, PageID # 1312). Lighting Resources, LLC constructed a building around the machine. (TOSHA Investigative Summary at 2, RE 101-1, PageID # 1146). The system installed by REI had a "baghouse type filter on the outside of the building." (Declaration of Steve Barnett ¶ 9, RE 95-1, PageID # 1053).

For training, Mr. Sharp showed Lighting Resources, LLC how to turn the

machine on and off and where to find the emergency stops. (Deposition of Scott Sharp 59:1-5, RE 101-2, PageID # 1323). He did not discuss aluminum dust with Lighting Resources, LLC. (*Id*. 59:6-8, RE 101-2, PageID # 1323). REI did not provide any written warning about dust, either. (*Id*. 59:21-24, RE 101-2, PageID # 1323).

When the machine started up in January 2018, it filled the room with smoke. (TOSHA Investigative Summary at 2, RE 101-1, PageID # 1146). REI returned on January 31, 2018, to install an additional fan and ductwork, which resolved the smoke issue. (*Id*.); (Declaration of Steve Barnett ¶ 9, RE 95-1, PageID # 1053).

The first explosion in the hammermill shredder assembly happened on or about February 5, 2018. (TOSHA Investigative Summary at 2, RE 101-1, PageID # 1146); (Declaration of Steve Barnett ¶ 12, RE 95-1, PageID # 1054). This was "shortly after" the installation. (Deposition of Joey Walls 52:23-24, RE 101-10, PageID # 1408).

Mr. Barnett suspected that airbag charges were accumulating in the machine and exploding at the same time. (Declaration of Steve Barnett ¶ 12, RE 95-1, PageID # 1054). He sent REI a "little drawing" of the problem, as he imagined it, and two options for closing off a compartment inside the hammermill. *See* (Steve Barnett Email, RE 101-1, PageID # 1236-39). REI made the modification under Mr. Barnett's direction. (Declaration of Steve Barnett ¶ 12, RE 95-1, PageID #

1054).  REI did not do research or testing to make sure the modification would

work.  (Deposition of Joey Walls 52:23-53:15, RE 101-10, PageID # 1408).  The

modification lasted from February 27 to March 9, 2018.  (TOSHA Investigative

Summary at 1, RE 101-1, PageID # 1147).

The incident that killed Mr. Cash happened on March 14, 2018.

(Defendant's Statement of Undisputed Facts ¶ 29, RE 95, PageID # 1049);

(Plaintiff's Response to Defendant's Statement of Undisputed Facts ¶ 29, RE 100,

PageID # 1105).  Security camera footage showed that Mr. Cash was standing near

the nonferrous metal bin of the hammermill shredder assembly.  (TOSHA

Investigative Summary at 1, RE 101-1, PageID # 1145).  A fire started in the bin.

(*Id.*).  Mr. Cash used a hand tool to rake the fire, but it only grew.  (*Id.*).  As the

room filled with smoke, he used a fire extinguisher.  (*Id.*).  An explosion then

occurred, killing Mr. Cash and wounding another employee.  (*Id.*).  The explosion

leveled three masonry walls around the machine and blew the roof off.  (TOSHA

Inspection Narrative at 4, RE 101-1, PageID # 1137).

The Tennessee Occupational Safety and Health Administration determined

that the primary cause of the explosion was combustible aluminum dust from the

shredding of airbag charges and seatbelt pretensioners.  (TOSHA Investigative

Summary at 6, RE 101-1, PageID # 1150); *accord* (Expert Report of Chris Cloney

at 19, RE 101-8, PageID # 1384).

11

## II.    THE DISTRICT COURT GRANTED SUMMARY JUDGMENT BECAUSE REI SUPPOSEDLY RELIED ON SPECIFICATIONS FROM ITS CUSTOMER

Ms. Cash-Darling filed the operative Second Amended Complaint with leave from the district court.  (Order, RE 35, PageID # n/a) (minute entry).  Suing as the personal representative of Mr. Cash's estate, she named REI as the sole defendant.  (Second Amended Complaint introduction, ¶¶ 1-2, RE 39, PageID # 834-35).

Lighting Resources, LLC and its insurance carrier moved to intervene, claiming a subrogation lien for workers' compensation payments made on Mr. Cash's behalf.  (Motion to Intervene, RE 33, PageID # 800-05).  However, they withdrew the motion with the district court's approval.  (Notice of Withdrawal, RE 40, PageID # 845-46); (Order, RE 41, PageID # n/a) (minute entry); (Order, RE 42, PageID # n/a) (minute entry).

Ms. Cash-Darling pleaded four types of products liability claim.  She alleged that REI negligently designed, integrated, marketed, and serviced the hammermill shredder assembly.  (Second Amended Complaint ¶ 6, RE 39, PageID # 839-40).  She alleged that REI breached the implied warranty of merchantability under Tenn. Code Ann. § 47-2-314 and the implied warranty of fitness for a particular purpose under Tenn. Code Ann. § 47-2-315.  (*Id*. ¶ 8, RE 39, PageID # 840-41).  Ms. Cash-Darling asserted that REI was strictly liable for a design defect in the hammermill

shredder assembly. (*Id.* ¶ 9, RE 39, PageID # 841-42). Under the strict liability heading, she also alleged that REI failed to give adequate warnings about the product. (*Id.* ¶ 10, RE 39, PageID # 842).

After discovery, REI moved for summary judgment on all claims. (Defendant's Motion for Summary Judgment, RE 93, PageID # 1030-32). It argued, "Because REI did not design the hammermill system at issue, and instead assisted LR with locating primarily used components that LR requested based on the design of LR's existing system, REI is not legally responsible for any alleged defect in the system as a whole." (*Id.* at 1-2, RE 93, PageID # 1030-31).

Ms. Cash-Darling opposed the motion. (Plaintiff's Response to Motion for Summary Judgment, RE 98, PageID # 1077-80). She argued that REI designed the hammermill shredder assembly, despite having no expertise in such products. (*Id.* at 1-2, RE 98, PageID # 1077-78).

The district court struck some of Ms. Cash-Darling's responses to REI's statement of undisputed facts and Ms. Cash-Darling's additional statement of undisputed facts. (Memorandum Opinion and Order, RE 134, PageID # 1716-29).

Key elements of liability were undisputed at summary judgment. REI did "not dispute that it is a seller or manufacturer of the integrated hammermill shredder system." (Memorandum Opinion and Order at 7, RE 135, PageID # 1736). Even though REI did not manufacturer all the components, it "assembled

the shredder assembly's components into a whole, and thus qualifies as a

manufacturer because it is an 'assembler' of the shredder assembly's component

parts." (*Id*. at 7-8 n.7, RE 135, PageID # 1736-37) (citing Tenn. Code Ann. § 29-

28-102(4)).

Nor did REI dispute "that the hammermill shredder as integrated was

defective and/or unreasonably dangerous." (*Id*. at 7-8, RE 135, PageID # 1736-

37). Ms. Cash-Darling showed that "the assembly exploded when it was put to its

intended use." (*Id*. at 7-8, RE 135, PageID # 1737).

REI did not dispute causation, either. By all accounts, the explosion of the

machine on March 14, 2018, killed Mr. Cash. (*Id*. at 4, RE 135, PageID # 1733).

The district court said that Ms. Cash-Darling could prevail if "REI

substantially participated in the integration of the hammermill system." (*Id*. at 8-9,

RE 135, PageID # 1737-38) (citing *Davis v. Komatsu Am. Indus. Corp*., 42 S.W.3d

34, 42 (Tenn. 2001)).

However, the decision turned on the contract specification defense. The

district court followed three cases cited by REI holding that manufacturers were

not liable for a design defect because they relied on plans and specifications from

their customers. (*Id*. at 9-10, RE 135, PageID # 1738-39) (citing *Hoverman v.

Harnischfeger Corp*., No. 90-1682, 1991 WL 158768, at *2-3 (6th Cir. Aug. 14,

1991), *Austin v. Clark Equip. Co*., 48 F.3d 833, 837 (4th Cir. 1995), and *Spangler*

*v. Kranco, Inc.*, 481 F.2d 373, 375 (4th Cir. 1973)).

The district court found these cases "on point" because Mr. Cash's employer, Lighting Resources, LLC, decided not to include a dust collection device in the hammermill shredder assembly. (*Id.* at 10, RE 135, PageID # 1739). As the district court saw the record, Mr. Barnett from Lighting Resources, LLC directed each step of the integration process. (*Id.* at 11, RE 135, PageID # 1740). REI relied on Mr. Barnett and "did not substantially contribute to the design or modification of the hammermill shredder assembly." (*Id.*). A manufacturer cannot rely on customer specifications if they have an obvious defect, but "the danger of combustible metal dust was not obvious to REI." (*Id.* at 11-12, RE 135, PageID # 1740-41).

The district court used the same reasoning with the strict liability, negligence, breach of warranty, and failure to warn claims. (*Id.* at 12-13, RE 135, PageID # 1741-42). Therefore, it granted REI's motion for summary judgment and dismissed all claims. (*Id.* at 13, RE 135, PageID # 1742).

## SUMMARY OF THE ARGUMENT

Tennessee created strong legal remedies for defective products to protect the public. A case like this, where a product took someone's life, demands a remedy most of all. Ms. Cash-Darling can satisfy all the elements of a products liability claim. REI did not dispute that it manufactured the hammermill shredder

assembly, that the machine was defective, or that the defect caused Mr. Cash's death.  In spite of this, the district court dismissed the case based on an extreme version of the contract specification defense that no Tennessee court has approved.

The defense does not apply as a matter of law to Ms. Cash-Darling's strict liability, failure to warn, or breach of warranty claims.  The Court must make an educated guess on how the Tennessee Supreme Court would decide this issue because it has not yet done so.  Across the country, courts have split on whether to allow the defense against a strict liability claim.  The better-reasoned cases do not.  The defense grows out of the elements of negligence, which are not at issue in strict liability.  This position aligns with Tennessee products liability law.  In Tennessee, strict liability remains strict.  Failure to warn and breach of warranty claims also impose a type of strict liability.  None of these claims depend on whether the manufacturer followed specifications.

The factual record precludes summary judgment for REI on any claim, whether in strict liability or negligence.  A reasonable jury could find that REI did not meet the requirements of the defense.

REI did not follow specifications from its customer.  As the President of REI candidly stated, "There wasn't none."  Lighting Resources, LLC, only gave a general idea of what it wanted.  It was not thinking about dust and did not say anything about dust.  REI fleshed out the design and handled dust collection on its

own.  It selected a dust collection device and chose how to incorporate that device into the hammermill shredder assembly.  Unfortunately, REI botched the job so badly that the machine exploded right after installation.  REI cannot lay the blame on nonexistent specifications.

The defense also has an exception for defects that would be obvious to a competent manufacturer.  This was such a defect.  Ms. Cash-Darling's expert explained that hammermills generate dust in normal operation and that they often explode.  This common knowledge has led to safety standards for hammermills that require effective dust collection.  Any competent manufacturer would have followed those standards and outfitted the machine with a proper dust collection system.  REI did not.  It made a one-time foray into metal recycling without educating itself on a matter of life and death.

REI sold a deadly product, and Tennessee law holds REI responsible.  The Court should reverse the summary judgment and remand this case for trial.

## ARGUMENT

## I.   THIS APPEAL CALLS FOR DE NOVO REVIEW

The Court reviews a grant of summary judgment de novo.  *Saginaw Chippewa Indian Tribe of Mich. v. Blue Cross Blue Shield of Mich*., 32 F.4th 548, 557 (6th Cir. 2022).  The movant must show "that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed.

17

R. Civ. P. 56(a).  The Court views the evidence in the light most favorable to the

nonmoving party and draws all reasonable inferences in that party's favor.

*Saginaw Chippewa Indian Tribe*, 32 F.4th at 557.  A dispute over material facts is

genuine "if the evidence is such that a reasonable jury could return a verdict for the

nonmoving party."  *Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

## II.    THE DISTRICT COURT MADE A LEGAL ERROR BY APPLYING THE CONTRACT SPECIFICATION DEFENSE TO CLAIMS THAT SOUND IN STRICT LIABILITY

In a diversity of citizenship case, the Court follows decisions of the forum

state's highest court.  *Tooling, Mfg. & Techs. Ass'n v. Hartford Fire Ins. Co*., 693

F.3d 665, 670 (6th Cir. 2012).  If the state's highest court has not spoken, then a

lower state appellate court may provide the rule of decision, unless the Court is

"convinced by other persuasive data that the highest court of the state would decide

otherwise."  *Id*. (quoting *Ziegler v. IBP Hog Market, Inc*., 249 F.3d 509, 517 (6th

Cir. 2001)).

The Tennessee Supreme Court would not permit REI to assert the contract

specification defense against Ms. Cash-Darling's strict liability claim or her related

claims of failure to warn and breach of warranty.  The defense clashes with the

basic principles of strict liability.

### A.    A Prima Facie Strict Liability Claim Has Nothing to Do with Plans and Specifications

The Tennessee Products Liability Act of 1978, Tenn. Code Ann. §§ 29-28-

18

101 to -108 ("TPLA"), governs any action for personal injury or property damage caused by a product, regardless of the theory of liability. *See id*. § 29-28-102(6) (defining "product liability action"). Claims of strict liability, negligence, breach of warranty, and failure to warn all fall under the TPLA. *See id*.

A prima facie claim requires the plaintiff to show that (1) the product was defective or unreasonably dangerous, (2) the defect existed at the time the product left the manufacturer's control, and (3) the defective product proximately caused the plaintiff's injury. *Sigler v. Am. Honda Motor Co*., 532 F.3d 469, 483 (6th Cir. 2008). These are the elements of strict liability, as codified in the TPLA. Some legal theories have additional elements not relevant to this appeal. *See Webb v. Ethicon, Inc*., No. 3:19-CV-461-TAV-DCP, 2020 WL 5503646, at *4 (E.D. Tenn. Sept. 11, 2020).

REI did not dispute the elements of strict liability, and the district court did not find any of them missing. Instead, REI changed the subject to plans and specifications.

**B.    No Authority from Tennessee Authorizes the Defense in a Strict Liability Case**

The district court relied on inapposite legal authority to dismiss the strict liability claim. *See* (Memorandum Opinion and Order at 9-10, RE 135, PageID # 1738-39). None of the cases came from Tennessee or involved strict liability. *See Hoverman v. Harnischfeger Corp*., No. 90-1682, 1991 WL 158768, at *2 (6th Cir.

19

Aug. 14, 1991) (applying Michigan law and stating that "[t]he district judge gave a standard jury instruction on negligence"); *Austin v. Clark Equip. Co*., 48 F.3d 833, 835 (4th Cir. 1995) ("Virginia does not recognize a cause of action based on strict liability in tort; and, the strict liability claim was dismissed."); *Spangler v. Kranco, Inc.*, 481 F.2d 373, 374 (4th Cir. 1973) (also applying Virginia law and stating that "the plaintiff alleged negligence on the part of Kranco").

The TPLA provides certain defenses, but they do not include the contract specification defense. *See* Tenn. Code Ann. § 29-28-104(a) (raising rebuttable presumption that product is not unreasonably dangerous if it complies with regulatory standards); *id*. § 29-28-106 (barring action against seller, as opposed to manufacturer, in certain circumstances).

The Tennessee Supreme Court has not considered the contract specification defense in a products liability case. It has, however, denied an attempt by a real estate contractor to avoid liability because it "satisfactorily and correctly performed its work according to the contract documents and specifications." *See Johnson v. Oman Const. Co*., 519 S.W.2d 782, 787 (Tenn. 1975). The contractor did not get a special defense or a more lenient standard. The Tennessee Supreme Court remanded the case for further proceedings on a regular negligence claim. *Id*. at 788-89; *see also Burks v. Belz-Wilson Properties*, No. 02A01-9411-CV-00254, 1996 WL 84859, at *2-3 (Tenn. Ct. App. Feb. 26, 1996) (following *Johnson* and

holding that contractor "had a duty to use reasonable care under the circumstances not to engage in conduct that would foreseeably cause injury to others," even though contractor's work "was in strict compliance with the plans and specifications provided").

*Johnson* suggests that the Tennessee Supreme Court would disapprove the contract specification defense. The court would not have a principled reason to limit the liability of product manufacturers but not real estate contractors in the same situation. Furthermore, as explained below, defendants have a much stronger argument for using the defense in a negligence case, compared to a strict liability case. If the defense did not succeed in negligence before the Tennessee Supreme Court, then it definitely would not succeed in strict liability.

Tennessee's lower appellate court has recognized the contract specification defense but only in an unreported decision and only in the context of a negligence claim. An employee who suffered on-the-job injuries sued Blue Chip Enterprises Maintenance, Inc., the company that installed a track system at his workplace. *Brawner v. Blue Chip Enters. Maint., Inc*., 1990 WL 138996, at *1 (Tenn. Ct. App. Sept. 26, 1990). His employer, Florida Steel Corporation, had designed the track system and supervised its installation. *Id*. The employee only sued Blue Chip for negligence. *Id*. at *2. Strict liability was "not at issue." *Id*.

The Court of Appeals called *Johnson* "highly instructive" but went a

different direction. *See id*. at *2-3. It took the contract specification defense from a treatise:

> [O]ne who employs a contractor to make a chattel for him, like one who employs a contractor to erect a structure on his premises (as to which see § 385), usually provides not only plans but also specifications, which often state the material which must be used. . . . In such a case, the contractor is not required to sit in judgment on the plans and specifications or the materials provided by his employer. The contractor is not subject to liability if the specified design or material turns out to be insufficient to make the chattel safe for use, unless it is so obviously bad that a competent contractor would realize that there was a grave chance that his product would be dangerously unsafe.

*Id.* at *3 (quoting *Restatement (Second) of Torts* § 404 cmt. a (1965)) (emphasis omitted).

Under this standard, "Blue Chip was entitled to assume that Florida Steel's design of the lancing platform was safe unless the fact that the design did not provide for stops to be placed at both ends of the track rendered the design so obviously unsafe that no reasonable person would have followed it." *Id*. at *4. The Court of Appeals reversed a summary judgment for Blue Chip because factual issues remained as to the defense, proximate causation, and damages. *Id*.

Since *Brawner* only involved a negligence claim, the viability of the contract specification defense against a strict liability claim is an open question. This Court must decide how the Tennessee Supreme Court would rule, bearing in mind that a similar defense failed in *Johnson*.

**C.    Other Jurisdictions Have Split Almost Evenly on This Issue**

Many federal and state courts have held that strict liability claims are not subject to the contract specification defense. *Challoner v. Day & Zimmermann, Inc.*, 512 F.2d 77, 83 (5th Cir. 1975) (Texas law), *vacated on other grounds*, 423 U.S. 3 (1975); *Wirth v. Clark Equip. Co.*, 457 F.2d 1262, 1265, 1267 (9th Cir. 1972) (Oregon law); *Janusz v. Symmetry Med. Inc.*, 256 F. Supp. 3d 995, 1006 (E.D. Wis. 2017) (Wisconsin law); *Johnston v. United States*, 568 F. Supp. 351, 354 (D. Kan. 1983) (Kansas law); *Abdul-Warith v. Arthur G. McKee & Co.*, 488 F. Supp. 306, 311 (E.D. Pa. 1980) (Pennsylvania law), *aff'd*, 642 F.2d 440 (3d Cir. 1981); *Roy v. Star Chopper Co.*, 442 F. Supp. 1010, 1020-21 (D.R.I. 1977) (Rhode Island law), *aff'd*, 584 F.2d 1124 (1st Cir. 1978); *Rawlings v. D. M. Oliver, Inc.*, 159 Cal. Rptr. 119, 121-22 (Cal. Ct. App. 1979); *Dorse v. Armstrong World Indus., Inc.*, 513 So. 2d 1265, 1267 (Fla. 1987); *Michalko v. Cooke Color & Chem. Corp.*, 451 A.2d 179, 183 (N.J. 1982); *cf. Maldonado v. Creative Woodworking Concepts, Inc.*, 796 N.E.2d 662, 666-67 (Ill. App. Ct. 2003) (likening plaintiff's breach of warranty claim to strict liability claim and holding that defendant could not assert defense).

These courts see the defense as inherently tied to negligence, in contrast to "strict liability where the duty of care is not an issue. As the Eleventh Circuit has noted, the contract specification defense is not, strictly speaking, a defense at all

but an aspect of the negligence elements of foreseeability and duty of care."

*Dorse*, 513 So. 2d at 1267 (citing *Shaw v. Grumman Aerospace Corp.*, 778 F.2d

736, 739 (11th Cir. 1985), *overruled on other grounds by Boyle v. United Techs.*

*Corp.*, 487 U.S. 500 (1988)).

The law of negligence requires someone to take reasonable care to avoid a

foreseeable risk of harm.  "Intuitively it makes sense that an entity that has no role

in designing a product should bear no liability if the product is defectively

designed.  But that intuitive reaction follows only when plaintiff's theory of

recovery is negligence."  *Janusz*, 256 F. Supp. 3d at 1001; *see also Johnston*, 568

F. Supp. at 354 ("A necessary corollary of the fact that the contract specification

defense has its source in ordinary negligence principles is that it does not apply to

actions grounded in strict liability.").

Other courts have extended the contract specification defense to strict

liability claims.  *Thompson v. Hirano Tecseed Co.*, 456 F.3d 805, 809-10 (8th Cir.

2006) (Minnesota law); *Water Pollution Control Auth. of City of Norwalk v.*

*Flowserve US Inc.*, No. 3:14-CV-00549 (VLB), 2018 WL 1525709, at *24-25 (D.

Conn. Mar. 28, 2018) (Connecticut law), *aff'd*, 782 F. App'x 9 (2d Cir. 2019);

*Rardon v. Holland, LP*, 279 F. Supp. 3d 93, 97-99 (D.D.C. 2017) (District of

Columbia law); *Herrod v. Metal Powder Prods.*, 886 F. Supp. 2d 1271, 1275 (D.

Utah 2012) (Utah law); *Housand v. Bra-Con Indus., Inc.*, 751 F. Supp. 541, 544-45

(D. Md. 1990) (Maryland law); *McCabe Powers Body Co. v. Sharp*, 594 S.W.2d

592, 594-95 (Ky. 1980); *Bloemer v. Art Welding Co*., 884 S.W.2d 55, 56 (Mo. Ct.

App. 1994); *Moon v. Winger Boss Co*., 287 N.W.2d 430, 434 (Neb. 1980);

*Houlihan v. Morrison Knudsen Corp*., 768 N.Y.S.2d 495, 496 (N.Y. App. Div.

2003); *Queen City Terminals, Inc. v. Gen. Am. Transp. Corp*., 653 N.E.2d 661,

672-73 (Ohio 1995); *cf. Hatch v. Trail King Indus., Inc*., 656 F.3d 59, 69-70 (1st

Cir. 2011) (Massachusetts law) (applying defense to warranty claim that

represented a form of strict liability).[2]

Many of these cases pay little or no attention to the differences between

negligence and strict liability.  Some simply follow what they describe as "a

growing majority."  *See*, *e.g*., *Rardon*, LP, 279 F. Supp. 3d at 99.  The camp that

restricts the defense to negligence and the camp that extends it to strict liability are

of nearly equal size.  The existence of a bare majority, depending on how one

counts, does not determine Tennessee law.

---

[2] One case that is sometimes cited with the foregoing does not belong.  In *Mesman v. Crane Pro Services*, 512 F.3d 352, 357 (7th Cir. 2008), the court reviewed a jury instruction that a manufacturer could not be liable under Indiana law for open and obvious dangers.  Drawing an "illuminating parallel" with the issue before it, the court mentioned the contract specification defense and other tort rules to show that defendants can be liable for open and obvious dangers.  *Id*. at 358-59.  Since the plaintiffs appealing in *Mesman* did not pursue that line of argument, the court ended up ruling on the different ground that the erroneous jury instruction did not determine the verdict.  *Id*. at 359.  The court did not hold that the contract specification defense applies to strict liability claims in Indiana.

The most substantial reason given for extending the defense is that a particular state, "like other jurisdictions, has stepped away from a stringent application of strict liability against defendants who are not the cause of injuries that arise from defective products." *See Herrod*, 886 F. Supp. 2d at 1276. Utah's legislature, for example, abolished joint and several liability so that each party in the chain of distribution is only liable for its own fault. *Id.*; *see also Thompson*, 456 F.3d at 809 ("Minnesota merges negligence and strict liability claims into a single products liability theory, which employs a reasonable-care balancing test to determine whether a product is defective."); *Kern v. Roemer Mach. & Welding Co.*, 820 F. Supp. 719, 721 (S.D.N.Y. 1992) (stating that the defense applies in both negligence and strict liability, as the two theories are "almost functionally equivalent" in New York), *aff'd*, 996 F.2d 302 (2d Cir. 1993); *McCabe*, 594 S.W.2d at 594 ("We think it apparent that when the claim asserted is against a manufacturer for deficient design of its product the distinction between the so-called strict liability principle and negligence is of no practical significance . . . . In either event the standard required is reasonable care.").

If a state waters down its strict liability doctrine, that may very well open the door to the contract specification defense. A court might say that the defense applies to strict liability claims, but, in reality, the state does not have strict liability to begin with.

**D.      Tennessee Has True Strict Liability with No Room for the Defense**

The Tennessee Supreme Court would join the camp that refuses to allow the contract specification defense in strict liability.  This follows from the nature of the defense and Tennessee's rigid adherence to strict liability.

The defense does originate in the law of negligence.  In the only Tennessee case recognizing the defense, the plaintiff made "allegations of negligence alone," and the court relied on comment a to the *Restatement (Second) of Torts* § 404. *Brawner*, 1990 WL 138996, at *2-3.  That section of the treatise is entitled "Negligence in Making, Rebuilding, or Repairing Chattel."  The main text states, "One who as an independent contractor negligently makes, rebuilds, or repairs a chattel for another is subject to the same liability as that imposed upon negligent manufacturers of chattels."  Comment a elaborates on "the standard of care and diligence" and then sets forth the contract specification defense.  Another section of the treatise deals with strict liability, and it does not mention the contract specification defense.  *See Restatement (Second) of Torts* § 402A (entitled "Special Liability of Seller of Product for Physical Harm to User or Consumer").

The defense ties in with the negligence standard.  Since the customer knows how it will use the product, the manufacturer does not have to second-guess the customer's plans and specifications.  This makes intuitive sense but only in the realm of negligence, where the manufacturer would normally have to use

reasonable care to avoid harm.  *Janusz*, 256 F. Supp. 3d at 1001.  If the law makes the manufacturer strictly liable, then the degree of care does not matter.  Only the defect and the injury matter.

The exception for obvious defects also reveals the connection to negligence. A manufacturer may follow its customer's design without fear of liability, "unless [the design] is so obviously bad that a competent contractor would realize that there was a grave chance that his product would be dangerously unsafe." *Brawner*, 1990 WL 138996, at *3 (quoting *Restatement (Second) of Torts* § 404 cmt. a) (emphasis omitted).  The reference to a "competent contractor" goes to reasonable care.  The reference to a "grave chance" of the product being "dangerously unsafe" goes to foreseeability of harm.  Thus, relying on the customer becomes unreasonable and negligent when danger is staring the manufacturer in the face.

Unlike some states, Tennessee still holds manufacturers strictly liable without any consideration of negligence.  The Tennessee Supreme Court has stood firm on this for decades.  *See Nye v. Bayer Cropscience, Inc*., 347 S.W.3d 686, 692-93 (Tenn. 2011) ("Further, a product liability action may be brought against a manufacturer or seller on strict liability grounds, with no proof of negligence, if the product causing injury to person or property 'is determined to be in a defective condition or unreasonably dangerous at the time it left the control of the manufacturer or seller.'") (quoting Tenn. Code Ann. § 29-28-105(a)) (footnote

omitted); *Owens v. Truckstops of Am.*, 915 S.W.2d 420, 431 (Tenn. 1996) ("Proof of negligence on the part of the manufacturer or seller is not required."); *Whitehead v. Toyota Motor Corp.*, 897 S.W.2d 684, 693 (Tenn. 1995) ("There is still no requirement that negligence on the part of a manufacturer be proved, only that the manufacturer distributed a defective or unreasonably dangerous product."); *Ford Motor Co. v. Eads*, 457 S.W.2d 28, 30 (Tenn. 1970) ("This Court has heretofore recognized that strict liability exists upon the manufacturer of a product without proof of negligence on his part, under the circumstances outlined in 2 *Restatement (Second) Torts*, s 402A.").

Following specifications does not protect a manufacturer from strict liability because strict liability does not ask *why* the manufacturer made a defective product. Using the contract specification defense to dismiss strict liability claims would fundamentally alter products liability in Tennessee. A change like that can only come from the legislature or the Tennessee Supreme Court.

### E.    The Defense is Incompatible with the Policies in Tennessee Law

Tennessee adopted strict liability "(1) to encourage greater care in the manufacture of products that are distributed to the public, and (2) to relieve injured consumers from the burden of proving negligence on a manufacturer's part." *Whitehead*, 897 S.W.2d at 693. Letting manufacturers shift responsibility for design defects can only lessen the incentive to make products safe. It also creates

more issues for litigation, such as whether the manufacturer relied on customer

specifications and whether the defect was obvious.  *See Brawner*, 1990 WL

138996, at *3.  An injured plaintiff should not have to litigate these negligence

issues in a strict liability suit.

A court might see the policies differently where the plaintiff knowingly

"acquiesced" in the bad specifications, had "heavy involvement in the

manufacturing process," and is "in a position to know and prove that the

manufacturer might have been negligent."  *See Queen City Terminals*, 653 N.E.2d

at 672-73 (suit by oil and chemical company BP against manufacturer of train cars

that leaked dangerous chemical).  In that unusual situation, the plaintiff does not

need the benefit of strict liability.  This case presents the more typical situation

where a defective product injured an unsuspecting individual who played no part in

the product's design or manufacture.

The defense has more unacceptable policy consequences where a defective

product injures an employee.  The workers' compensation statute immunizes an

employer from tort liability.  *Snyder v. LTG Lufttechnische GmbH*, 955 S.W.2d

252, 254 n.4 (Tenn. 1997) (citing Tenn. Code Ann. § 50-6-108(a)).  For reasons of

fairness, a manufacturer cannot use the comparative fault doctrine to attribute fault

to the plaintiff's employer in a products liability case.  *Id.* at 255.  That would

reduce the damages owed by the manufacturer but leave the plaintiff unable to

collect damages from the employer. *Id*. The Tennessee Supreme Court "made a policy decision to leave immune employers out of the assessment of fault." *Id*. at 256.

Tennessee has made REI strictly liable and immunized Mr. Cash's employer, Lighting Resources, LLC. Workers' compensation only paid to bury Mr. Cash. *See* (Intervening Complaint ¶ 3, RE 33-1, PageID # 804). If REI can defeat this case by blaming Lighting Resources, LLC, it will eliminate the only tort remedy for Mr. Cash's needless death. That turns strict liability on its head. The Tennessee Supreme Court would not recognize such a defense.

**F.    For the Same Reasons as the Strict Liability Claim, the Failure to Warn and Breach of Warranty Claims Are Not Subject to the Defense**

Ms. Cash-Darling asserted claims for failure to warn and breach of warranty. (Second Amended Complaint ¶¶ 8, 10, RE 39, PageID # 840-42). These claims sound in strict liability. *See Lind v. Beaman Dodge, Inc*., 356 S.W.3d 889, 896 n.7 (Tenn. 2011) ("A claim for strict liability may be properly alleged based upon the fail[ure] to warn consumers of the dangers of a particular product at the time of sale.") (alteration in original, internal quotations mark omitted); *Browder v. Pettigrew*, 541 S.W.2d 402, 404 (Tenn. 1976) (stating that breach of warranty, like strict liability, does not require proof of negligence).

The reasons for not allowing the contract specification defense in strict liability have equal force with regard to the failure to warn and breach of warranty

claims.  *See Maldonado*, 796 N.E.2d at 666-67 (holding that defense "is not relevant to a breach of warranty cause of action"); *Campbell v. ITE Imperial Corp*., 733 P.2d 969, 975-76 (Wash. 1987) (holding that customer's participation in product design was "irrelevant" because it did not relieve manufacturer of duty to warn); *Michalko*, 451 A.2d at 187 (affirming that "an independent contractor has a duty to warn of the dangers of a machine built to the design specifications of the buyer").

## G.    This Appeal Does Not Involve the Component Parts Doctrine

Some of the filings below discuss another legal concept called the component parts doctrine.  The component parts doctrine does not affect Ms. Cash-Darling's appeal.

The manufacturer of a non-defective component may still be liable if it substantially participates in the integration of the component into the final product, causing the final product to be defective.  *Davis v. Komatsu America Industries Corp*., 42 S.W.3d 34, 42 (Tenn. 2001) (citing *Restatement (Third) of Torts: Products Liability* § 5(b) (1998)).  For example, this could happen if the component manufacturer specially designs or selects a component to work well in the final product.  *Id*. at 41 (citing *Restatement (Third) of Torts: Products Liability* § 5(b) cmt. e).  Merely designing a component to the buyer's specifications does not make the component manufacturer liable.  *Id*.

The component parts doctrine bears a resemblance to the contract specification defense, but they do very different things. The contract specification defense protects a final product manufacturer from liability if it followed its customer's specifications. The component parts doctrine extends liability beyond the final product manufacturer to a component manufacturer, even though the component manufacturer did not make a defective item.

Citing *Davis*, Ms. Cash-Darling argued that REI manufactured the hammermill shredder assembly because it substantially participated in the integration of the overall system. *See* (Memorandum Supporting Plaintiff's Response to Motion for Summary Judgment at 6-8, RE 99, PageID # 1086-88). This argument became moot when the district court took a more direct path to the same conclusion. REI assembled all the components of the hammermill shredder assembly and thereby met the statutory definition of "manufacturer." (Memorandum Opinion and Order at 7-8 n.7, RE 135, PageID # 1736-37) (citing Tenn. Code Ann. § 29-28-102(4)). As the manufacturer of the final product, REI is strictly liable for injuries caused by a defect in the final product. *See*, *e.g.*, *Nye*, 347 S.W.3d at 692-93.

The district court still considered *Davis* relevant and said that Ms. Cash-Darling could prevail by showing that REI substantially participated in the integration of the hammermill shredder assembly. (Memorandum Opinion and

Order at 8-9, RE 135, PageID # 1737-38). However, the analysis immediately shifted from *Davis* to the contract specification defense. *See* (*id*. at 9-12, RE 135, PageID # 1738-41). Although the district court saw a connection between the component parts doctrine and the contract specification defense, the decision ultimately rested on the latter. The district court found *Spangler*, *Austin*, and *Hoverman* to be "on point," and those cases only deal with the defense. *See* (*id*. at 10, RE 135, PageID # 1739). Also, the district court's discussion of obvious defects only pertains to the defense. *See* (*id*. at 11-12, RE 135, PageID # 1740-41).

REI took the position that *Davis* "has no applicability to this case, and REI has not relied upon the component part doctrine as a defense." (Defendant's Reply in Support of Motion for Summary Judgment at 7, RE 104, PageID # 1477); *accord* (Defendant's Response to Plaintiff's Motion to Alter or Amend at 8, RE 142, PageID # 1768).

To the extent the district court blended the component parts doctrine with the contract specification defense and meant to apply them together, Ms. Cash-Darling had enough evidence to survive summary judgment, either way. REI played a major role in designing the defective product.

## III. THE DISTRICT COURT FAILED TO VIEW THE RECORD IN A LIGHT FAVORABLE TO MS. CASH-DARLING AND MISAPPLIED THE DEFENSE TO THE FACTS

The contract specification defense raises a "factual issue[ ]." *See Brawner*, 1990 WL 138996, at *4 (reversing summary judgment and remanding case for trial). To prevail at summary judgment, REI needed to show beyond a genuine dispute that it met all the requirements.

Keeping the burden on REI is particularly appropriate if the Court applies the defense to Ms. Cash-Darling's strict liability, failure to warn, and breach of warranty claims. The defense goes outside the elements of those claims and would, therefore, act as an affirmative defense. *See Am. Ref-Fuel Co. of Niagara, LP v. Gensimore Trucking, Inc.*, No. 02-CV-814C F, 2007 WL 2743449, at *3 (W.D.N.Y. Sept. 18, 2007); *Hopfer v. Neenah Foundry Co*., 477 S.W.3d 116, 124-27 (Mo. Ct. App. 2015).

The record does not support summary judgment for two reasons. First, REI helped design the defective product. Second, REI could not permissibly rely on its customer because the defect was so obvious that any competent manufacturer would fix it.

### A. A Genuine Issue of Material Fact Exists on Whether REI Just Followed Specifications or Contributed to the Defective Design

The contract specification defense saves a manufacturer from having to "sit in judgment on the plans and specifications or the materials provided by his

35

employer." *Restatement (Second) of Torts* § 404 cmt. a. To use the defense, the manufacturer must show that it received specifications and followed them.

This requires something concrete from the customer. Specifications are, after all, specific. A legal dictionary defines "specification" as "1. The act of making a detailed statement, esp. of the measurements, quality, materials, or other items to be provided under a contract. 2. The statement so made." *Black's Law Dictionary* (11th ed. 2019).

In addition, the customer's specifications must include the defect giving rise to litigation. "The contractor is not subject to liability *if the specified design* or material turns out to be insufficient to make the chattel safe . . . ." *Restatement (Second) of Torts* § 404 cmt. a (emphasis added). The customer could specify part of the product design but leave the rest to the manufacturer. Whenever the manufacturer uses its own plan, it "is required to exercise care in all these particulars." *Id*.

Summary judgment will not lie if the manufacturer contributed to the defective design. *See Thompson*, 456 F.3d at 811 (reversing summary judgment where specifications "did not describe the shape, size, base material, or adjustment mechanisms" of defective parts and evidence showed that customer and manufacturer jointly developed those parts); *Nygaard v. United Parcel Serv. Gen. Servs. Co.*, 1 F. Supp. 2d 1173, 1183 (D. Or. 1998) ("[T]he court concludes that a

jury could find that Toppan Moore and Inforite participated too much during the design phase of the DIAD project for the contract specifications defense to apply.").

Courts have entered summary judgment or a directed verdict where the customer alone chose the defective design. Most times, the customer demanded the very thing that made the product unsafe. *See Rardon, LP*, 279 F. Supp. 3d at 99 (customer gave "extremely detailed contract specifications" for machine that "included not only the location of the hydraulic hose reels, but the exact brand, type, and size hose to be used"); *Herrod*, 886 F. Supp. 2d at 1273 (customer gave "detailed specifications" for trailers that required "Pro-Torq nuts" securing wheels to axles); *McCabe*, 594 S.W.2d at 593 (customer gave "detailed and complete" specifications for aerial boom that "specifically required that the bucket on the boom have one open side").

In some cases, "'a customer exercise[d] an option to purchase a product without a safety feature.'" *See Austin*, 48 F.3d at 837 (quoting *Butler v. Navistar Int'l Transp. Corp*., 809 F. Supp. 1202, 1209 (W.D. Va. 1991)). The customer may have refused a safety feature offered by the manufacturer. *See id.* (manufacturers "offered audible alarms and strobe lights as optional safety devices that were not purchased"). Alternatively, the customer may have prepared specifications that omitted a safety feature. *See Spangler*, 481 F.2d at 375

(manufacturer relied on "industrial expertise" of customer, whose "plans and specifications" did not require warning device).  The common thread of these cases is that the customer made a deliberate choice, taking discretion away from the manufacturer.

The facts of this case make summary judgment inappropriate.  REI helped design the hammermill shredder assembly and the faulty dust collection system, specifically.

Lighting Resources, LLC did not provide anything clear enough to be called specifications.  The President of REI admitted this:

> Q.     Where are the specifications that were used in the assembly and construction of the system if these are not they?

> A.     There wasn't none.  This was just a used system.

(Deposition of Scott Sharp 45:4-8, RE 101-2, PageID # 1319).

Mr. Barnett of Lighting Resources, LLC simply described his original system to REI and asked for "some equipment that was similar to what we had, but with a more durable, more heavy duty shredder, and one that was capable of processing a greater amount of material."  (Declaration of Steve Barnett ¶ 6, RE 95-1, PageID # 1052).  The two companies had some further, unspecified discussions about the components.  (*Id*.).  Mr. Walls from REI testified, "[H]e told me that he knew how to do it, he just needed something that could do it faster, more volume."  (Deposition of Joey Walls 14:1-8, RE 101-10, PageID # 1399).

Asking for some equipment that is similar but stronger does not amount to a set of specifications.

Lighting Resources, LLC did not prepare a design drawing or similar documentation when ordering the hammermill shredder assembly.  After the machine exploded the first time, Mr. Barnett designed a modification to prevent airbag charges from accumulating inside.  (Declaration of Steve Barnett ¶ 12, RE 95-1, PageID # 1054).  His "little drawing" had no measurements and barely described the metal plate or steel flange he was proposing to add.  *See* (Steve Barnett Email, RE 101-1, PageID # 1236-39).  Even if one could characterize his sketch as specifications, they did not relate to the overall design of the machine or the dust problem that caused the fatal explosion.

Lighting Resources, LLC did not specify anything about dust collection because the issue did not cross Mr. Barnett's mind.  He did not mention dust to REI at any point.  (Deposition of Joey Walls 22:12-14, RE 101-10, PageID # 1401).  "With regard to removing air from the building in which the system was installed, LR's concern was solely focused on removing the visible smoke created by processing air bag modules, and that was the only concern I relayed to REI." (Declaration of Steve Barnett ¶ 9, RE 95-1, PageID # 1053).  Mr. Barnett did not ask for a dust collector, but he did not tell REI to exclude one.  The issue did not occur to him.

REI, on the other hand, had some experience with dust collectors.  It sold dust collectors but not smoke exhaust systems.  (Deposition of Scott Sharp 11:9-11, 39:1-40:3, RE 101-2, PageID # 1311, 1318).  REI has "learned more and more about doing more around air system stuff," particularly with paper recycling.  (Deposition of Joey Walls 56:9-18, RE 101-10, PageID # 1409).

The invoice from REI stated that the hammermill shredder assembly would include a "[d]ust collector," even though Lighting Resources, LLC had not asked for one.  (Invoice at 1, RE 101-5, PageID # 1342).  REI now says it made an "error on the paperwork" and the invoice really referred to a fan for smoke.  (Deposition of Scott Sharp 15:2-16, 25:4-8, RE 101-2, PageID # 1312, 1314).  A jury could reasonably doubt that explanation.  Even a layman knows that smoke and dust are different.  A dust collector removes dust from the air and traps it.  An exhaust fan carries smoke away and disperses it.  The most plausible explanation of the invoice is that it meant what it said.

Mr. Eichelberger's drawings of the hammermill shredder assembly show a "NEW AIR FILTER" outside the building.  (Shredder Plan at 5, RE 101-9, PageID # 1393).  Mr. Eichelberger testified that he only made his drawings to show the layout and dimensions of the machine.  (Deposition of Ethan Eichelberger 32:21-23, RE 95-4, PageID # 1071).  Regardless, the drawings show that REI planned to install a new air filter.

Mr. Eichelberger got information from Spencer about "the available bags for the dust separator for the Lighting Resources project." (Ethan Eichelberger Email, RE 101-6, PageID # 1345). He was exploring "which of these filters would be the most useful with Nitrogen gas." (*Id*.). The email from Spencer discussed a "tubular bag separator" and a "baghouse." (*Id*.).

These communications had to do with dust collection, not a simple fan for smoke. A tubular separator is a "solid material separating device[ ]" used for dust collection. (Deposition of Chris Cloney 75:19-76:1, RE 101-11, PageID # 1453). Baghouses are also "used for dust collection, not commonly used for smoke exhaust." (*Id*. 76:5-8, RE 101-11, PageID # 1453). Finally, "[i]t's hard to argue that something that's called a dust separator was intended for smoke; smoke is exhaust." (*Id*. 76:11-12, RE 101-11, PageID # 1453).

The hammermill shredder assembly installed by REI did, in fact, have a dust collection device. "REI originally installed a system at the rear of the building with a baghouse type filter on the outside of the building." (Declaration of Steve Barnett ¶ 9, RE 95-1, PageID # 1053). Mr. Barnett's description of the as-built system is consistent with the invoice, the drawings, and the emails. Mr. Barnett was still concerned about visible smoke, so REI added a larger fan to the front of the building to satisfy him. (*Id*.). But the baghouse filter that REI originally installed at the rear of the building served to remove dust.

REI designed a defective dust collection system totally outside of Mr.

Barnett's limited instructions.  REI placed the dust collector outdoors and

connected it to the hammermill with metal ducting through the wall.  (Expert

Report of Chris Cloney at 11, RE 101-8, PageID # 1376).  Once the ducting came

inside the building, it was

> routed upwards towards the top of the infeed hopper above the
> hammermill unit.  This may allow for smoke to be exhausted above
> the hammermill, but it is not the correct configuration for collecting
> metal dust from the shredding operation.  For dust collection,
> connecting the ducting to the bottom side of the hammermill unit
> and/or at transfer points in the discharge shaker table or discharge
> conveyor are preferable for effective capture of combustible metal
> dust.

(*Id*. at 12, RE 101-8, PageID # 1377).  Stated simply, REI did not put the ducting

in the right spots to suck aluminum dust into the air filter outside.  The equipment

was for dust collection, but "the way it was installed, it wouldn't have operated

correctly to do that."  (Deposition of Chris Cloney 77:10-15, RE 101-11, PageID #

1454).  REI did not submit an expert opinion rebutting Dr. Cloney's at summary

judgment.

The district court granted summary judgment because it mistakenly believed

that Mr. Barnett "controlled what safety features would or would not be included"

and "chose not to include a dust collection device."  (Memorandum Opinion and

Order at 10, RE 135, PageID # 1739).  Mr. Barnett did not even think about dust,

much less give REI instructions about it.  REI knew that dust was dangerous and

handled the issue independently.  It sourced equipment from Spencer.  It set up the air filter and ducting without any input whatsoever from Mr. Barnett.

The district court did not view the evidence in the light most favorable to Ms. Cash-Darling, as it should have.  *See Saginaw Chippewa Indian Tribe*, 32 F.4th at 557.  A reasonable jury could reject REI's defense because REI contributed to the defective design.

**B.    A Genuine Issue of Material Fact Exists on Whether the Defect Was Objectively Obvious**

The contract specification defense cannot work if the product design was "so obviously bad that a competent contractor would realize that there was a grave chance that his product would be dangerously unsafe."  *Restatement (Second) of Torts* § 404 cmt. a; *see also Brawner*, 1990 WL 138996, at *4 (standard restated as "so obviously unsafe that no reasonable person would have followed it").

The words "competent" and "reasonable" signify an objective standard.  *Cf. ACLU of Ohio Found., Inc. v. DeWeese*, 633 F.3d 424, 434 (6th Cir. 2011) (stating that the "reasonable person" standard for Establishment Clause cases is objective, similar to tort law).  Therefore, the exception for obvious defects asks whether the manufacturer "should have been aware" of a dangerous condition, not whether the manufacturer was aware.  *See Hannah v. Gregg, Bland & Berry, Inc.*, 840 So. 2d 839, 847-48 (Ala. 2002).

Ms. Cash-Darling raised a genuine issue of fact as to whether the defect in

the hammermill shredder assembly was objectively obvious.  The very nature of a

hammermill makes it vulnerable to dust explosions.  Hammermill systems

naturally generate a lot of dust.  (Deposition of Chris Cloney 55:9-13, RE 101-11,

PageID # 1448).  They also generate heat.  (*Id*. 86:19-22, RE 101-11, PageID #

1456).  The danger of fire was established when REI performed its work for

Lighting Resources, LLC.  (*Id*. 47:3-7, RE 101-11, PageID # 1446).  Dust

explosions in hammermills are "well known," (*id*. 15:13-14, RE 101-11, PageID #

1438), and "quite common," (*id*. 47:20-24, RE 101-11, PageID # 1446).

This led to the creation of "a full standard on preventing . . . explosions in

hammermills."  (*Id*. 15:13-16, RE 101-11, PageID # 1438).  NFPA 484 (2015),

entitled "Standard for Combustible Metals," and ASTM E1248-90 (2017), entitled

"Standard Practice for Shredder Explosion Protection," set forth generally accepted

best engineering practices on the subject.  (Expert Report of Chris Cloney at 6, 18,

RE 101-8, PageID # 1371, 1383).

NFPA 484 requires dust collection at recycling facilities that generate

combustible aluminum dust.  (*Id*. at 18, RE 101-8, PageID # 1383).  Government

authorities in Tennessee use this standard.  Tennessee adopted the 2012

International Fire Code, which lists NFPA 484 as the "Explosion Protection

Standard for Combustible Metals."  (*Id*.).  TOSHA found that the hammermill

shredder assembly in this case did not have a dust collection system that complied

with NFPA 484.  (TOSHA Investigative Summary at 6-7, RE 101-1, PageID # 1150-51).  In a citation issued to Lighting Resources, LLC, TOSHA instructed the company to follow the testing and dust collection requirements in NFPA 484. (TOSHA Citation at 8, RE 101-1, PageID # 1123).

The district court noted that the violation of safety regulations distinguishes this case from others where the contract specification defense succeeded. (Memorandum Opinion and Order at 10, RE 135, PageID # 1739).

Any competent manufacturer in REI's shoes would have realized the importance of effective dust control.  REI knew it was making a hammermill shredder assembly that would be shredding metal.  *See* (Deposition of Scott Sharp 13:12-18, RE 101-2, PageID # 1311) (stating that Mr. Barnett led REI through process of shredding metals).  Mr. Sharp claimed he "had no idea what the air bags were made out of." (*Id*. 12:2-3, RE 101-2, PageID # 1311).  However, he acknowledged that recyclers are commonly looking for nonferrous metals like aluminum.  (*Id*. 57:14-23, RE 101-2, PageID # 1322).  So many dust explosions have happened at hammermills that the industry and regulators widely understand the need for dust control.

To further state the obvious, a dust control system will only work if it is pulling air from the places that have dust.  The hammermill shredder assembly built by REI had abrupt drops at the transfer points, which caused dust to rise

through the air and settle on nearby surfaces. (Expert Report of Chris Cloney at 12-13, RE 101-8, PageID # 1377-78). This is where the ducting should have gone. (*Id*. at 13, RE 101-8, PageID # 1378). REI routed the ducting to the top of the hammermill, instead, which is "not the correct configuration for collecting metal dust." (*Id*. at 12, RE 101-8, PageID # 1377).

The district court incorrectly focused on REI's subjective "ignorance." *See* (Memorandum Opinion and Order at 11-12, RE 135, PageID # 1740-41). It found that "the danger of combustible metal dust was *not obvious to REI*." (*Id*. at 12, RE 135, PageID # 1741 (emphasis added). This finding does not answer the relevant question. REI may have been ignorant, but it cannot use the contract specification defense if the danger would have been obvious to a competent manufacturer.

Ms. Cash-Darling certainly argued that REI did not understand dust collection. *See* (Memorandum Supporting Plaintiff's Response to Motion for Summary Judgment at 11, RE 99, PageID # 1091) (stating that REI "failed to understand the important factor of dust collection, and the explosion risks associated therewith"); (*id*. at 14, RE 99, PageID # 1094) (stating that "[i]t was impossible for REI to warn LR about the likelihood of combustible dust because REI tested this machine outside where dust does not accumulate"). This was relevant to the negligence claim, but it does not impact the contract specification defense or contradict Ms. Cash-Darling's present argument on appeal. REI

committed negligence by failing to educate itself on dust collection so it could provide adequate safeguards. At the same time, the defect would have been obvious to a competent manufacturer, which makes the contract specification defense unavailable.

The district court also found that REI reasonably relied on Mr. Barnett's instructions and experience in metal recycling. (Memorandum Opinion and Order at 12, RE 135, PageID # 1741). This nods to an objective standard but does not go far enough to help REI. The contract specification defense presumes that if a customer is giving out specifications, it has more experience and expertise than the manufacturer. *Johnston*, 568 F. Supp. at 354. That is why the manufacturer gets to rely on the customer. However, the defense only goes so far. If the design has an objectively obvious defect, the manufacturer can no longer rely. The district court never found whether the defect in the hammermill shredder assembly was objectively obvious.

Ms. Cash-Darling has evidence that a competent manufacturer would have seen the defect and corrected it. The decision on this "factual issue[ ]" belongs to a jury. *See Brawner*, 1990 WL 138996, at *4.

## CONCLUSION

The Court should reverse the summary judgment granted to REI and remand the case for further proceedings.

47

Respectfully submitted,

/s/ Michael J. Wall
Michael J. Wall
Janna Maples
BRANSTETTER, STRANCH &
   JENNINGS, PLLC
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, TN 37203
Telephone: (615) 254-8801
Facsimile: (615) 255-5419
michaelw@bsjfirm.com
jannam@bsjfirm.com

John C. Duff
Marion M. Reilly
HILLIARD MARTINEZ
   GONZALES LLP
719 South Shoreline Boulevard
Corpus Christi, Texas 78401
Telephone: (361) 882-1612
Facsimile: (361) 882-3015
jduff@hmglawfirm.com
marion@hmglawfirm.com

*Attorneys for Appellant*

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief was prepared with 14-point Times New Roman, a proportionally spaced typeface.  This brief contains a total of 11,205 words, as calculated by my word processing software, excluding the statements and other contents specified in Federal Rule of Appellate Procedure 32(f).

/s/ Michael J. Wall
Michael J. Wall

## CERTIFICATE OF SERVICE

I hereby certify that on July 6, 2022, a copy of this brief was served on counsel of record for all parties through the Court's CM/ECF system.

/s/ Michael J. Wall
Michael J. Wall

# DESIGNATION OF RELEVANT DISTRICT COURT DOCUMENTS

(Case No. 2:19-cv-00034)

| DESCRIPTION | RECORD ENTRY # | PAGEID # RANGE |
|---|---|---|
| Second Amended Complaint | 39 | 834-44 |
| Defendant's Motion for Summary Judgment | 93 | 1030-32 |
| Declaration of Steve Barnett | 95-1 | 1051-54 |
| Plaintiff's Response to Motion for Summary Judgment | 98 | 1077-80 |
| TOSHA File | 101-1 | 1114-1306 |
| Deposition of Scott Sharp | 101-2 | 1307-35 |
| Invoice | 101-5 | 1341-43 |
| Ethan Eichelberger Email | 101-6 | 1344-45 |
| Expert Report of Chris Cloney | 101-8 | 1362-87 |
| Shredder Plan | 101-9 | 1388-93 |
| Deposition of Joey Walls | 101-10 | 1394-1433 |
| Deposition of Chris Cloney | 101-11 | 1434-64 |
| Memorandum Opinion and Order | 135 | 1730-42 |
| Judgment | 136 | 1743 |
| Plaintiff's Motion to Alter or Amend | 137 | 1744-53 |
| Memorandum Opinion and Order | 143 | 1772-76 |
| Plaintiff's Notice of Appeal | 144 | 1777-78 |